UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PINEBRIDGE INVESTMENTS, PARTNERS LLC and PINEBRIDGE GEM, II, LTD.<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ABDULAZIZ GEYLAN ZAPSU,<br><br>　　　　Defendant. | C.A. No. 14-CV-6500 |

## DECLARATION OF DEFENDANT ABDULAZIZ GEYLAN ZAPSU IN SUPPORT OF HIS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

I, Abdulaziz Geylan Zapsu, hereby declare as follows:

A. Personal Background

1. I was born in Istanbul, Turkey and am a citizen of the Republic of Turkey and Germany. I am 59 years old. Most people call me Aziz.

2. I live with my family in Istanbul. I have been a resident of Turkey for most of my adult life. I lived in Germany when I was a youth and at times as an adult.

3. I attended high school and university in Turkey. I have never attended any school or university in the United States.

4. For my entire adult life, I have been a businessman running businesses based in Turkey and Germany. These businesses sometimes have interests in other Middle East or European countries.

1

5. I have never been an employee of a company incorporated in the United States. I have never been employed to work in the United States.

6. I have never held a bank account in the United States.

7. I have never owned real estate in the United States.

8. I have never owned or registered a car in the United States or held a drivers' license issued by the United States.

9. I have never held any investment accounts in the United States.

10. Other than this case, I have never been a party or witness in any lawsuit or arbitration in the United States.

B. Visits to the United States

11. I visit the United States sporadically. As shown below, my primary reason to visit the United States has been to receive medical care, or to assist a family member who is receiving medical care. I have also made occasional trips just for tourism but not often.

12. When I travel to the United States I always use my German passport, as German citizens may enter the United States more easily. My older German passport was stolen and eventually returned to the German government, so I cannot refer to it. My current German passport was issued in May, 2012. It shows that I traveled to the United States three times since then, which is consistent with my memory.

   a. On October 18, 2012, I came to the United States for about six days as a tourist.

b. On April 9, 2014, I came to the United States for medical treatment. I stayed for approximately 15 days.

c. On June 3, 2014, I came to the United States for medical treatment. Due to unexpected complications, my hospitalization was extended for about three months.

13. From 2005 to April, 2012, I estimate I visited the United States on about four to five occasions, but I am not certain. These trips would typically last two to five days. I believe all but two were for the purpose of receiving medical treatment or overseeing a family member's medical treatment but I cannot be exact.

14. During these visits to the United States for medical treatment, I am not also coming for the purpose of conducting business. I do not look for business opportunities located in the United States, negotiate with people in the United States, or conduct other such business activities. I, of course, must place telephone calls and emails to Turkey and other places to attend to my Turkish business interests while I am in the U.S., but I am not in the U.S. to conduct such activities. Being in the U.S. is often inconvenient for conducting these contacts for my business matters. Appearing in a U.S. court would therefore be quite burdensome for me.

15. The only exceptions to the preceding paragraph relate to a supermarket business I founded in Turkey in 1995 and about two minimal contacts with AIG.

16. The supermarket business is known as BIM. This business is unrelated to AIG-PineBridge. I operated the business in Turkey and virtually all of the meetings relating to it occurred in Turkey. I made the following visits to the United States for BIM:

a. I visited the United States once or twice for a few days in 1994 and early 1995 to speak with potential partners in this supermarket business but no agreement ever came from these talks and they never became partners.

b. From 1999 to 2005, I came about two times to speak with an investor in BIM.

c. In 2005, I came once for about two to three days to participate in a "road show" for a public offering of BIM's shares on the Istanbul stock exchange. In April, 2006, I ceased to have any further role in BIM.

17. The Non-Competition Agreement that is the subject of the ongoing London arbitration involved a chain of retail health and beauty stores in Turkey called For You. AIG invested in For You. AIG and I conducted most of our meetings about For You in Turkey. I can recall two exceptions:

a. In 2006 or 2007, I was visiting the United States for a reason unrelated to business. It might have been for medical reasons but I am not sure. I told Scott Foushee of AIG that I would be in the United States. He invited me to dinner with Patrick McGinness, also of AIG. We had a polite dinner and did not conduct any business that I can recall.

b. In 2008, AIG and I were having strained relations over For You. I came to New York to meet Mr. Foushee, his inhouse lawyer John Leone, and perhaps others. I estimate the meeting lasted 15-30 minutes and it was wholly unproductive.

18. McDermott Will & Emery LLP has represented me in two arbitrations, both adverse to the AIG private equity business. AIG rebranded its private equity business as PineBridge and sold it to a Hong Kong company in 2010, as part of the aftermath of the 2007-08 financial crisis.

The first arbitration went from 2009 to 2011. All of my meetings with McDermott on this arbitration were held in Turkey, and the hearing was in London. With respect to the second arbitration, all of my meetings with McDermott on that have been held in Turkey and the hearing once again is to be held in London.

19. My attorney, Michael Kendall, has been a personal friend of both mine and my family for over 20 years. When I was about to start my medical care in June 2014, he visited me and my family for three days. We spent about one hour discussing the pending London arbitration, but that was incidental to the personal visit. I did not request or initiate this discussion.

Balsu USA

20. Balsu USA is a small, private company my brother incorporated in Delaware in 1994. It is a small sales office, primarily for trading in Turkish-food products. It has typically had two employees: an office administrator and a business/sales person.

21. For noncommercial reasons relating to my brother's political involvement in Turkey, from December, 2005 to May, 2008, he did not want to be a shareholder in Balsu USA. Thus, he transferred the shares in Balsu USA to me, and I was listed as its chairman. He was not required to do this transfer for any legal or regulatory purpose. It related to a partisan political squabble. During this time, Balsu USA's only office was in Miami, Florida.

22. I played no role in managing or supervising Balsu USA. The office ran itself, which was easy because the business/sales person had joined Balsu USA in 1994 and remains there through today. He is a trusted family friend and employee. I did not draw any income from

Balsu USA or receive revenue of any kind from Balsu USA. I never visited the Miami office. I never came to the United States to conduct any business on behalf of Balsu USA. I never spoke with its customers. I never hired or fired any of its employees. I did not manage any lawsuits for it in the United States and am unaware if it was a party to any.

23. I held the shares as a perfectly ethical accommodation for my brother. I never thought of myself as doing business in the United States.

24. Since the shares were placed back in my brother's name in May 2008, I have played no role in Balsu USA. I played no role in it prior to December 2005.

25. The pending London arbitration seeks compensation for what AIG-PineBridge did to damage my investment in For You and a second grocery retail chain called A-101. The A-101 business was based in Turkey and did not have any United States investors. I never visited the United States for any reasons connected to A-101.

26. I have never thought of the United States as a place where I did business or expected to participate in its court system. My few, minor business visits to the United States have been short and insignificant, and I ended my role in BIM in 2006. Thus my expectation has been that the United States is a place where I would not conduct any meaningful business as I would not have a reason to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 26, 2014

_____
Abdulaziz Geylan Zapsu