**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| PINEBRIDGE INVESTMENTS, PARTNERS LLC and PINEBRIDGE GEM, II, LTD. | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ABDULAZIZ GEYLAN ZAPSU, | ) ) |
| Defendant. | ) ) |

C.A. No. 14-CV-6500

_____

**AMENDED MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 2

ARGUMENT ............................................................................................................. 4

I.   PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO ESTABLISH A
     SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS .............................. 5

     A.   Plaintiffs Have Not Established a Likelihood of Success in Proving this
          Court has Personal Jurisdiction over Mr. Zapsu .................................................. 5
          1.   Mr. Zapsu does not have sufficient minimum contacts with the U.S ........ 5
          2.   The Exercise of Jurisdiction Over Mr. Zapsu Would be
               Unreasonable ............................................................................................ 8
     B.   The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims ............... 10
          1.   The Federal Arbitration Act Does Not Confer Subject Matter
               Jurisdiction over Plaintiffs' Claims ........................................................ 10
          2.   The Court Lacks Any Other Source of Subject Matter Jurisdiction ........ 15
     C.   Plaintiffs Have Not Met Their Burden to Show a Likelihood of Success on
          the Merits Because They Are Bound by the Non-Competition Agreement ........ 16
          1.   Plaintiffs are bound under the veil piercing/alter ego theory .................. 16
          2.   Plaintiffs Are Estopped From Denying Arbitration ................................. 20

II.  PLAINTIFFS  CANNOT  ESTABLISH  IRREPARABLE  HARM ............................ 21

III. THE BALANCE OF EQUITIES DISFAVORS GRANTING INJUNCTIVE
     RELIEF ..................................................................................................... 24

IV.  THE PUBLIC INTEREST FAVORS DENYING THE MOTION ................................. 24

CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bureau of Shipping v. Tencara Shipyard SPA*,
170 F.3d 349 (2d Cir. 1999)............................................................................20

*In re: American Express Financial Advisors Securities Litig.*,
672 F.3d 113 (2d. Cir. 2011).....................................................................13, 14

*Asahi Metal Indus. Co. v. Sup. Court of Cal., Solano Cnty.*,
480 U.S. 102 (1987)...........................................................................................8

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120 (2d Cir. 2002)...............................................................................8

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)...........................................................................................6

*C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*,
No. 13-11788-DJC, 2014 WL 815189 (D. Mass. Mar. 3, 2014)...........................7

*Camofi Master LDC v. College P'ship, Inc.*,
452 F. Supp. 2d 462 (S.D.N.Y. 2006).............................................................19

*CBF Industria de Gusa S/A/ v. AMCI Holdings, Inc.*,
No. 13 CIV. 2581 RWS, 2014 WL 1388519, __ F.Supp.2d __(S.D.N.Y. Apr.
9, 2014) ....................................................................................................10, 11

*Chevron Corp. v. Naranjo*,
667 F.3d 232 (2d Cir. 2012)............................................................................15

*China Trade and Development v. MV Choong Yong*,
837 F. 2d 33 (2d. Cir. 1987)..............................................................................9

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985).............................................................................21

*Da Silva v. Kinsho Intern. Corp.*,
229 F.3d 358 (2d Cir. 2000).............................................................................16

*Danny's Const. Co, Inc. v. Birdair, Inc.*,
136 F. Supp. 2d 134 (W.D.N.Y. 2000) ............................................................23

*Dedon GmbH v. Janus et Cie*,
10 CIV. 04541 CM, 2010 WL 4227309 (S.D.N.Y. Oct. 19, 2010)................................. *passim*

*Dedon GmbH v. Janus et Cie,*
    No. 10-cv-04541 (CM) 2011 WL 666174 (S.D.N.Y. Feb. 8, 2011)........................................11

*Enargy Power Co. Ltd. v. Xiaolong Wang,*
    No. 13-11348-DJC, 2013 WL 6234625 (D. Mass. Dec. 3, 2013) ............................................16

*Farrell v. Subway Int'l, B.V.,*
    No. 11 CIV. 08 JFK, 2011 WL 1085017 (S.D.N.Y. Mar. 23, 2011)..........................13, 14, 15

*Ganis Corp. of Cali. v. Jackson,*
    635 F.Supp. 311 (D. Mass. 1986) ............................................................................................7

*Gerling Global Reinsurance Corp. v. Sompo Japan Ins. Co.,*
    348 F. Supp. 2d 102 (S.D.N.Y. 2004)....................................................................................11

*Ghassabian v. Hematian,*
    08CIV.4400(SAS), 2008 WL 3982885 (S.D.N.Y. Aug. 27, 2008)...................................12, 15

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
    131 S. Ct. 2846 (2011) ..............................................................................................................5

*Hallet v. Li & Fung, Ltd.,*
    95-cv-8917 (JSM), 1996 WL 487952 (S.D.N.Y. Aug. 27, 1996) .............................................7

*Ibeto Petrochemical Industries Ltd v. M/T BEFFEN,*
    475 F. 3d 56 (2d. Cir. 2007)....................................................................................................25

*Int'l Creative Mgmt., Inc. v. Abate,*
    No. 07 CIV. 1979 PKL, 2007 WL 950092 (S.D.N.Y. Mar. 28, 2007)....................................23

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi*
    *Negara,*
    500 F.3d 111 (2d Cir. 2007)........................................................................................9, 10, 25

*Lakah v. UBS AG,*
    No. 07 CIV. 2799 MGC, 2014 WL 1100142 (S.D.N.Y. Mar. 20, 2014) ..........................16, 17

*Lexington Children's Center v. District Council 1707,*
    No. 04-Civ.1532(PKC), 2004 WL 540475 (S.D.N.Y. Mar. 17, 2004)....................................22

*Life Tech. Corp. v. AB Sciex Pte. Ltd.,*
    803 F. Supp. 2d 270 (S.D.N.Y. 2011)....................................................................................20

*Maesfield AG v. Colonial Oil Indus., Inc.,*
    No. 05-cv2230 (PKL), 2005 WL 911770 (S.D.N.Y. Apr. 18, 2005) ................................13, 15

*Marjam Supply Co. v. Firestone Bldg. Products Co., LLC,*
    No. 11-7119 WJM, 2013 WL 85086 (D.N.J. Jan. 7, 2013)....................................................24

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*,
    337 F.3d 125 (2d Cir. 2003)..................................................................22, 23, 24

*Mor v. Royal Caribbean Cruises Ltd.*,
    No. 12 CIV. 3845 JGK, 2012 WL 2333730 (S.D.N.Y. June 19, 2012) ..................................15

*Network Enterprises, Inc. v. APBA Offshore Prods., Inc.*,
    No. 01 CIV. 11765 (CSH), 2002 WL 31050846 (S.D.N.Y. Sept. 12, 2002) ...................17, 20

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013).......................................................................................4

*Oppenheimer & Co. Inc. v. Deutsche Bank AG*,
    No. 09 CIV. 8154 (LAP), 2009 WL 4884158 (S.D.N.Y. Dec. 16, 2009) ...............................24

*PDK Labs, Inc. v. Friedlander*,
    103 F.3d 1105 (2d Cir. 1997).......................................................................................7

*Porina v. Marward Shipping Co., Ltd.*,
    521 F.3d 122 (2d Cir. 2008).........................................................................................5

*Republic of Ecuador v. Chevron Corp.*,
    638 F.3d 384 (2d Cir. 2011)........................................................................................11

*Republic of Ecuador v. ChevronTexaco Corp.*,
    376 F. Supp. 2d 334 (S.D.N.Y. 2005)............................................................................11

*Republic of Iraq v. ABB AG*,
    769 F. Supp. 2d 605 (S.D.N.Y. 2011)......................................................................14, 15

*Retail Software Servs., Inc. v. Lashlee*,
    854 F.2d 18 (2d Cir. 1988)...........................................................................................7

*Robins v. Zwirner*,
    713 F. Supp. 2d 367 (S.D.N.Y. 2010)............................................................................23

*S.E.C. v. Straub*,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013) (Sullivan, J.).......................................................5, 6

*Sarhank Grp. v. Oracle Corp.*,
    404 F.3d 657 (2d Cir. 2005)........................................................................................16

*Satcom Int'l Group PLC v. Orbcomm Int'l Partners, L.P.*,
    49 F. Supp. 2d 331 (S.D.N.Y.1999)......................................................................13, 14, 15

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,
    198 F.3d 88 (2d Cir. 1999)..........................................................................................16

iv

*Southland Corp. v. Keating*,
      465 U.S. 1 (1984) ................................................................................................13

*Stanchart Sec. Int'l, Inc. v. Galvadon*,
      No. 12CV2522-LAB MDD, 2012 WL 5286952 (S.D. Cal. Oct. 24, 2012) ..........................22

*Steel Co. v. Citizens for a Better Env't*,
      523 U.S. 83 (1998) ................................................................................................10

*Stevenson v. Tyco Int'l (US) Inc. Supplemental Executive Ret. Plan*,
      No. 04-CV-4037 (KMK), 2006 WL 2827635 (S.D.N.Y. Sept. 29, 2006) ...........................15

*TomTom, Inc. v. Norman IP Holdings, LLC*,
      890 F.Supp.2d 160 (D. Mass. 2012) ......................................................................6

*URS Corp. v. Lebanese Co. for Dev. & Reconstruction of Beirut Cent. Dist. SAL*,
      512 F. Supp. 2d 199 (D. Del. 2007) ............................................................ *passim*

*Walden v. Fiore*,
      134 S. Ct. 1115 (2014) ..........................................................................................6

*Weitzman v. Stein*,
      897 F.2d 653 (2d Cir. 1990) ..................................................................................5

*Winter v. Natural Res. Def. Council, Inc.*,
      555 U.S. 7 (2008) ....................................................................................................4

**Statutes**

9 U.S.C. § 203 ........................................................................................................10, 11

9 U.S.C. § 208 ..............................................................................................................13

All Writs Act ................................................................................................................15

Declaratory Judgment Act ..........................................................................................15

Federal Arbitration Act ...................................................................................... *passim*

**Other Authorities**

Arleen Jacobius, *Investors win in battle with AIG*, Pensions & Investments
      Online, December 26, 2005,
      http://www.pionline.com/article/20051226/PRINT/512260725/investors-win-
      in-battle-with-aig (accessed Aug. 28, 2014) ..........................................................2

Federal Rule of Civil Procedure Rule 4(k)(2) ............................................................5

ICC Rules Article 6(3) ..................................................................................................9

## INTRODUCTION

Plaintiffs PineBridge Investments Partners LLC and PineBridge GEM II, Ltd. ("Plaintiffs") filed this suit seeking a preliminary injunction to prevent Defendant Abdulaziz Geylan Zapsu ("Mr. Zapsu")—a dual Turkish/German citizen with few material contacts with the United States—from obtaining any meaningful recovery in a London-seat arbitration he commenced against Plaintiffs and a private equity fund they manage and control, PineBridge Global Emerging Markets Partners II L.P. ("GEM II Fund"). On the surface, Plaintiffs contend they did not sign the relevant arbitration agreement and that Mr. Zapsu should therefore arbitrate his claims solely against the GEM II Fund. At the same time, however, Plaintiffs refuse to confirm that the GEM II Fund is sufficiently capitalized to satisfy an arbitration award and the evidence shows that Plaintiffs controlled the GEM II Fund to such a degree that the fund had no ability to act on its own behalf. Plaintiffs' underlying intent is clear.  They are using the complex spider web of PineBridge corporate entities that manages and controls the GEM II Fund to strip it of any assets, offering the GEM II Fund as an empty shell in the London arbitration while denying that any adequately funded entity is obligated to arbitrate. The Court cannot countenance such a scheme.

Plaintiffs' intentions are further evidenced by the manner in which they have pursued this lawsuit.  The operative International Convention, to which the United States is a party, provides that the proper judicial forum to resolve Plaintiffs' claims about whether they have agreed to arbitrate would be an English Court—the situs of the arbitration. However, cognizant that English Courts are less likely to enjoin international arbitral proceedings, and in a clear example of forum shopping, Plaintiffs chose to file suit in the United States—a forum completely devoid of personal or subject matter jurisdiction—hoping to blur the distinction between domestic and international arbitrations and convince the Court to halt the arbitration in London.

Yet Plaintiffs have failed to meet their burden of establishing any of the four elements required to obtain a preliminary injunction.  Plaintiffs cannot show a substantial likelihood of success on the merits because the Court lacks subject matter and personal jurisdiction.  Also because of the way PineBridge has played fast and loose with its numerous corporate entities, Plaintiffs are bound by the arbitration clause. Further Plaintiffs' claim of irreparable harm is superficial and belated. Accordingly, the Court should deny their motion, and dismiss their complaint.

## BACKGROUND

Mr. Zapsu is a Turkish and German citizen who lives in Istanbul and has few material contacts[1] with the United States.  Zapsu Jur. Decl. ¶¶ 1-2.  He filed a London-seat arbitration, under English law, against Plaintiffs and their GEM II Fund, in the International Chamber of Commerce ("ICC") on May 16, 2014.  Compl. Exh. A; Declaration of Michael Kendall ("Kendall Decl.")  ¶ 9.

The GEM II Fund is an inert entity created by Plaintiffs' predecessors solely to hold assets. Kendall Decl. ¶ 3 & Ex. A.  It finances its investments with funds of PineBridge and others.[2] Because the GEM II Fund is just a "pot of money," it is incapable of acting except through the employees of other PineBridge entities—particularly Plaintiffs—who serve as its investment advisors, investment committee, manager, and general partner, etc. *Id.*  The PineBridge entities are all indirectly owned or controlled by PineBridge Investments Partners LLC ("PIP"). *Id.* ¶ 4 & Ex. A.

The London arbitration is based on a contract among Mr. Zapsu, the GEM II Fund, and others that PIP (then known as AIG Capital Partners, Inc.) representatives negotiated and signed on the GEM II Fund's behalf and that purported to bind the GEM II Fund. Compl., ECF No. ("D. __")

---

[1] For a full explanation of Mr. Zapsu's contacts with the United States, *see generally* Decl. of Defendant Abdulaziz Geylan Zapsu in Support of His Mot. to Dismiss For Lack of Personal Jurisdiction. ("Zapsu Jur. Decl.")

[2] *See* http://www.pionline.com/article/20051226/PRINT/512260725/investors-win-in-battle-with-aig (accessed Aug. 28, 2014).

7, at Exhs. A, B.  It relates to a chain of retail personal care stores in Turkey called For You in which AIG/PineBridge invested via the GEM II Fund.  Zapsu Jur. Decl. ¶ 17.  The contract contains an arbitration clause requiring all disputes "arising out of or in connection with" the agreement to be resolved in a London-seat arbitration under the rules of the ICC.  Compl. Exh. B, Non-Competition Agreement ("NCA"), dated May 16, 2006, Section 7.2.

Mr. Zapsu intends to prove in the arbitration, *inter alia*, that the PineBridge entities worked individually and in synch to violate the NCA and harm Mr. Zapsu by (1) improperly disclosing confidential financial information about him and his businesses to third parties; and (2) disparaging Mr. Zapsu and his business to third parties. Kendall Decl. ¶ 11. Mr. Zapsu also intends to prove that the PineBridge entities ignored their separate corporate forms, and acted as a single unit to commit the underlying breaches of contract that give rise to the arbitration.  Indeed, as far as Mr. Zapsu was concerned, he dealt with just a handful of PIP employees who did not identify themselves as representing or acting on behalf of just the GEM II Fund.  Declaration of Abdulaziz Geylan Zapsu In Opposition to Motion for a Preliminary Injunction ("Zapsu PI Decl.") ¶¶ 7-9.

Plaintiffs commenced this action on Friday August 15, 2014, moving for a preliminary injunction on the same day on the grounds that, under U.S. law,[3] Plaintiffs are not bound by the NCA's arbitration clause. *See* Compl., D. 7; Pl. Mot. for Prelim. Inj., D. 9. Mr. Zapsu believes that Plaintiffs' sole purpose in bringing this litigation is to ensure Mr. Zapsu can never collect any arbitral award by forcing him to pursue his claims against a completely empty shell.  Mr. Zapsu's belief is

---

[3] The laws of England govern both the conduct of the arbitration (including questions of who is bound to arbitrate) and the contract that gives rise to it. *See* NCA Section 7. Under English law, and pursuant to the ICC rules, the arbitral tribunal is the proper body to rule on its own jurisdiction. Article 6(3) of the ICC Rules provides that: "any question of jurisdiction . . . shall be decided directly by the arbitral tribunal." To the extent necessary, Mr. Zapsu will make submissions on the issue of jurisdiction to the arbitral tribunal in due course, not limited to the arguments outlined here.

based primarily on two facts: (1) PineBridge recently removed the GEM II Fund from its website as an active fund, and (2) after Mr. Zapsu's counsel asked PineBridge earlier this summer to confirm that the GEM II Fund remained adequately capitalized to participate in the arbitration and pay any award that might result, PineBridge refused to do so.  Kendall Decl. ¶¶ 13-14.

After Plaintiffs filed this complaint, Mr. Zapsu took immediate action to have it dismissed, first asking the Court to postpone briefing on Plaintiff's motion, D. 20 (endorsed order granting letter request for extension), moving to reconsider the Court's amended scheduling order, D. 18, and filing a pre-motion letter with the Court on August 22, 2014, outlining his dismissal arguments. D. 24. However, the Court has directed Mr. Zapsu to respond substantively to the instant motion, so Mr. Zapsu is now doing so, but without prejudice to any Rule 12 defense, including lack of personal jurisdiction or improper service of process. [4] Mr. Zapsu respectfully maintains the Court should grant Mr. Zapsu leave to file a motion to dismiss before the Court's September 19, 2014 hearing and resolve that motion before considering Plaintiffs' instant motion.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter*, 555 U.S. at 20). "A plaintiff who seeks a preliminary injunction that will alter

---

[4] As Mr. Zapsu argued in his motion to reconsider, D. 18, due to the nature of these proceedings, he has not yet been able to adequately develop the factual record to support this response. Accordingly, he renews the request for expedited discovery before argument of the instant motion, which he made in his motion to reconsider. Mr. Zapsu makes this request without waiving any rights to contest personal jurisdiction or any other Rule 12 defense.

the status quo must demonstrate a 'substantial' likelihood of success on the merits." *Id.* at 486

(citation omitted). Because Plaintiffs fail to meet this heavy burden, the Court must deny the motion.

## I.    PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO ESTABLISH A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    *Plaintiffs Have Not Established a Likelihood of Success in Proving this Court has Personal Jurisdiction over Mr. Zapsu*

Plaintiffs cannot establish they are substantially likely to succeed on the merits because, *inter alia*, the Court lacks personal jurisdiction over Mr. Zapsu. A district court simply "has no power to grant an injunction against a party over whom it has not acquired valid jurisdiction." *Weitzman v. Stein*, 897 F.2d 653, 659 (2d Cir. 1990). Further, when a plaintiff requests a preliminary injunction, it bears the burden to show a reasonable probability of success on personal jurisdiction.  *Id.*

The test for personal jurisdiction has two prongs: the minimum contacts prong and the reasonableness prong. *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 254 (S.D.N.Y. 2013) (Sullivan, J.). Minimum contacts test whether the defendant has a sufficient relationship to the forum to justify the exercise of jurisdiction. *Id.* Reasonableness tests whether exercising jurisdiction would be fair under the circumstances—even if the defendant has sufficient contacts. *Id.* Because Federal Rule of Civil Procedure Rule 4(k)(2) applies, the Court assesses Mr. Zapsu's minimum contacts with the United States as a whole. *Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 127 (2d Cir. 2008).

### 1.    *Mr. Zapsu does not have sufficient minimum contacts with the U.S.*

A defendant has sufficient minimum contacts with a forum to support specific jurisdiction[5] only when the defendant "purposefully availed" himself of doing business in the forum—thus

---

[5] A court can also exercise jurisdiction under a general theory, but only when the defendants contacts with the forum "are so 'continuous and systematic' as to render [him] essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). For Mr. Zapsu, a Turkish and German citizen who resides and does business primarily in Turkey and has visited the United States only sporadically, this clearly does not apply.  Zapsu Jur. Decl. ¶¶ 1-2.

invoking the "benefits and protections" of the forum's laws—and the plaintiff's claims arise out of or relate to those purposeful forum contacts. *Straub*, 921 F. Supp. 2d at 253-54 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)). If, considering all the circumstances, the defendant's forum contacts are of such a nature that he could reasonably foresee being haled into court related to those contacts, the court can exercise jurisdiction. *Burger King*, 471 U.S. at 474.

None of Mr. Zapsu's contacts with the United States "give rise" to Plaintiffs' claims in this case, as is evident from the face of their complaint. Plaintiffs' claims for injunctive and declaratory relief arise out of Mr. Zapsu initiating an arbitration in London, pursuant to a contract governed by English law, concerning two retail businesses based and operating in Turkey. By bringing arbitration Mr. Zapsu did not purposefully avail himself of the privilege of doing anything in the United States, much less invoke the "benefits and protections" of U.S. law. Further, Mr. Zapsu's commencement of an arbitration against two entities with U.S. places of business is not a "contact" that subjects him to personal jurisdiction in this Court.  As the Supreme Court recently explained in *Walden v. Fiore*, the minimum contacts analysis must focus on "the defendant's *contacts with the forum State itself*, not the defendant's contacts with persons who reside there."  134 S. Ct. 1115, 1122 (2014) (emphasis added).  In other words, the "mere fact" that Mr. Zapsu's request for arbitration may have "affected" the plaintiffs in the United States "does not suffice to authorize jurisdiction."  *Id.* at 1126.[6]

Mr. Zapsu's only U.S. contact[7] potentially related to Plaintiffs' suit is that he came to New

---

[6] Given the Supreme Court's clarification in *Walden* of the *Calder* effects-test, Plaintiffs' reliance on pre-*Walden* applications of *Calder* is suspect at best.  Even still, Courts applying the pre-*Walden* standard recognized that "for a court to exercise jurisdiction over a foreign defendant based upon effects in the United States, a foreign actor's activity in relation to the United States must be sufficiently extensive and regular to make the possibility of litigation in the United States a foreseeable risk of the business." *Straub*, 921 F. Supp. 2d at 254 (internal quotations and alterations omitted).  Such extensive and regular activities within the U.S. are absent here.

[7] The acts of Mr. Zapsu's U.S.-based counsel in support of the London arbitration do not

6

York in 2008 to meet with PineBridge representatives about the For You investment (one of the

startup companies at issue in the London arbitration). Zapsu Jur. Decl. ¶ 17(b).[8] However, the

meeting lasted only 15-30 minutes and was completely unproductive. *Id.* Even assuming this contact

is sufficiently related to the instant lawsuit, one meeting in the U.S. for a total of 30 minutes is not

enough to give the Court specific jurisdiction over Mr. Zapsu under the totality of the circumstances.

Such a meeting in the U.S. does not transform what could only be described as a Turkey-centered

relationship with Plaintiffs into a U.S.-centered relationship nor does it show Mr. Zapsu should have

reasonably foreseen being haled into U.S. courts to answer a lawsuit relating to the For You deal. In

fact, it does not even show that Mr. Zapsu purposefully availed himself of the benefits and

protections of U.S. law in relation to the For You deal, which was based in Turkey, and governed by

contracts selecting English law. Accordingly, this Court lacks any basis for specific jurisdiction over

Mr. Zapsu. *See C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, No. 13-11788-DJC, 2014 WL

815189, at *3 (D. Mass. Mar. 3, 2014) (concluding that alien defendant's lone contact with forum

---

establish a basis for personal jurisdiction because those acts had only an incidental connection to
the forum, and were neither a purposeful availment of U.S. law nor an acceptance of the
privilege of conducting business in the United States.  *Cf. TomTom, Inc. v. Norman IP Holdings,
LLC*, 890 F.Supp.2d 160, 171 (D. Mass. 2012) (finding no personal jurisdiction where defendant
merely retained counsel in the state to do legal work related to an out-of-state litigation) ("[I]t is
impossible to conclude that preparing materials in Massachusetts for filing elsewhere constitute
sufficient contacts[.]").  In contrast, cases that have found minimum contacts based on the acts of
an agent require *business-related* acts that are purposefully directed at the forum.  *See PDK
Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir. 1997) (finding jurisdiction proper where
attorney-agent's activities went *beyond* litigation-related work to include soliciting investments
for the defendant's business); *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 23 (2d Cir.
1988) (finding jurisdiction proper where agent undertook business activities on behalf of
defendant in the state); *Ganis Corp. of Cali. v. Jackson*, 635 F. Supp. 311, 317 (D. Mass. 1986)
(finding jurisdiction in California proper where attorney-agent acted to obtain financing from
California on defendants' behalf); *Hallet v. Li & Fung, Ltd.*, 95-cv-8917 (JSM), 1996 WL
487952 (S.D.N.Y. Aug. 27, 1996) (finding a *prima facie* showing of jurisdiction over two
foreign corporations due to the acts of their "representative" on the board of a U.S. corporation).

[8] Mr. Zapsu's other U.S. contacts are completely unrelated to this lawsuit or the arbitration.  *See
generally*, Zapsu Jur. Decl.

state relating to formation of contract governed by foreign law did not give rise to personal

jurisdiction where conduct at issue related to its out-of-state breach).

      2.      <u>*The Exercise of Jurisdiction Over Mr. Zapsu Would be Unreasonable.*</u>

Even were the facts different such that Mr. Zapsu had the requisite minimum contacts with

the United States, the Court still could not exercise personal jurisdiction because doing so would be

unreasonable under the circumstances. *Asahi Metal Indus. Co. v. Sup. Court of Cal., Solano Cnty.*,

480 U.S. 102, 113 (1987). To assess reasonableness, a court must consider (1) the burden on the

defendant, (2) the forum state's interests in adjudicating the dispute, (3) the plaintiff's interest in

obtaining relief in the forum, (4) the judicial system's interest in the most efficient resolution of

controversies, and (5) the policies of "other nations whose interests are affected by the assertion of

jurisdiction." *Id.* at 113, 115. The weaker a plaintiff's showing of minimum contacts, the more

emphasis a court should place on the reasonableness inquiry. *Bank Brussels Lambert v. Fiddler*

*Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002). Here, with only one brief U.S. contact that

is even remotely relevant, reasonableness is critical and the *Asahi* factors demonstrate that the

Court's exercise of jurisdiction over Mr. Zapsu would be unreasonable.

First, the burden on Mr. Zapsu in defending this suit in New York would be severe, as he is a

foreign individual who lives thousands of miles from the courthouse. Zapsu Jur. Decl. ¶ 14; *see*

*Asahi*, 48 U.S. at 114. Second, New York has a minimal interest in adjudicating this dispute. The

underlying claims are being heard in London and are governed by English law. Plaintiffs do not ask

this Court adjudicate the underlying dispute; they seek only to enjoin the arbitration on the ground

they have not agreed to arbitrate. Moreover, as discussed more fully in the subject matter jurisdiction

section below, the relevant treaty governing international arbitrations would have Plaintiffs'

arbitrability claims heard by an English court, not a U.S. Court, anyway. *See Dedon GmbH v. Janus*

*et Cie*, 10 CIV. 04541 CM, 2010 WL 4227309, at *9 (S.D.N.Y. Oct. 19, 2010) (recognizing that "a

challenge to any jurisdictional determination by the London ICC must be brought in English courts, not here"). Third, for similar reasons, Plaintiffs' interest in obtaining relief here is not very high.

Fourth, "the judicial system's interest in the most efficient resolution of controversies" strongly weighs against the Court's exercise of jurisdiction here. The most efficient resolution of Plaintiffs' claims would be to let the arbitration in London proceed so that the arbitral tribunal could assess whether Plaintiffs are bound by the arbitration agreement.  The ICC rules permit the tribunal to rule on questions of arbitrability.  *See* ICC Rules Article 6(3).  Halting the London proceedings so that the Plaintiffs can raise those claims here is the height of judicial inefficiency.

Fifth and finally, the policies of "other nations whose interests are affected by the assertion of jurisdiction," is perhaps the most important factor in this case given the international treaty governing arbitration proceedings. And this factor strongly counsels against the court's exercise of personal jurisdiction. As discussed more fully in the subject matter jurisdiction section below, the United States is party to an international convention that sets forth the proper location for challenges to international arbitrations of the sort Plaintiffs raise here. That convention directs that such challenges should be heard in a court where the arbitration is proceeding, which here would be an English court. The Court's exercise of jurisdiction over Mr. Zapsu would therefore not only directly interfere with a foreign arbitration proceeding, but would also usurp the role of the English courts—which the Second Circuit has warned against. *See China Trade and Development v. MV Choong Yong*, 837 F. 2d 33, 35 (2d. Cir. 1987) ("The fact that the injunction operates only against the parties, and not directly against the foreign court, does not eliminate the need for due regard to principles of international comity because such an order effectively restricts the jurisdiction of the court of a foreign sovereign."). Accordingly, international comity strongly counsels against the Court's exercise of jurisdiction over Mr. Zapsu. *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak*

*Dan Gas Bumi Negara*, 500 F.3d 111, 125 (2d Cir. 2007) ("[C]oncerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes . . . require us to protect the regime established by the Convention for enforcement of international arbitral awards.").

> B.  The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims

The Court must dismiss Plaintiffs' complaint because it also lacks subject matter jurisdiction over their claims for injunctive and declaratory relief. Subject matter jurisdiction is a "threshold question" that "must be resolved . . . before proceeding to the merits." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). "Without jurisdiction . . . the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* at 94.

> 1.  *The Federal Arbitration Act Does Not Confer Subject Matter Jurisdiction over Plaintiffs' Claims.*

Plaintiffs assert, incorrectly, that the Court has subject matter jurisdiction pursuant to Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 *et seq.* Chapter 2 codifies and incorporates the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 330 (the "New York Convention"). It creates original federal jurisdiction only over "action[s] [and] proceeding[s] falling under the [New York] Convention." 9 U.S.C. § 203.

The New York Convention in turn delineates the types of actions and proceedings a court can hear based on whether the court has "primary" or "secondary" jurisdiction with respect to the arbitration at issue.[9] A court has primary jurisdiction if it is located in the country where the

---

[9] *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 500 F.3d 111, 115 n.1 (2d Cir. 2007) ("In contrast to the limited authority of secondary-jurisdiction courts to review the arbitral award, courts of primary jurisdiction, usually the courts of the country of the arbitral situs, have much broader discretion to set aside an award."); *CBF Industria de Gusa S/A/ v. AMCI Holdings, Inc.,* No. 13 CIV. 2581 RWS, 2014 WL 1388519, at *9 ___ F.Supp.2d ___(S.D.N.Y. Apr. 9, 2014) ("A distinction exists between a court's powers

arbitration takes place—in this case, the United Kingdom.  *CBF Industria de Gusa S/A/*, 2014 WL

1388519, at *9. A court has secondary jurisdiction if it is located in any other signatory country—

such as the United States here. *Id. Only a court with primary jurisdiction* can hear challenges to the

arbitral tribunal's jurisdiction and to enjoin or stay arbitral proceedings for that purpose. *See Dedon*,

2010 WL 4227309, at *9 (recognizing that a "challenge to any jurisdictional determination by the

London ICC must be brought in English courts, not here" and that plaintiff should have sought "a

stay of arbitration from a court of primary jurisdiction in England."). A court with secondary

jurisdiction has limited powers and can only (1) compel arbitration or (2) confirm an arbitral award.

*See URS Corp. v. Lebanese Co. for Dev. & Reconstruction of Beirut Cent. Dist. SAL*, 512 F. Supp.

2d 199, 208 (D. Del. 2007) (recognizing that under "the FAA and the New York Convention,  . . .

[courts] may only grant subject matter jurisdiction over actions to compel arbitration or to enforce an

arbitral award"); *Gerling Global Reinsurance Corp. v. Sompo Japan Ins. Co.*, 348 F. Supp. 2d

102, 105 (S.D.N.Y. 2004) ("[T]his Court concludes that it lacks subject matter jurisdiction over

this dispute.  Gerling does not request that this Court confirm the underlying arbitral award . . .

[or] compel arbitration."). Accordingly, when a U.S. court is a court of secondary jurisdiction, it has

no subject matter jurisdiction to hear an action to *enjoin* a foreign arbitration because such an action

does not "fall under" the New York Convention.  *See Republic of Ecuador v. ChevronTexaco Corp.*,

376 F. Supp. 2d 334, 348 (S.D.N.Y. 2005) ("In this action, however, Plaintiffs do not request the

Court to refer the parties to arbitration, but rather ask the Court to *prevent* arbitration. . . . It is not at

all clear that an action seeking such relief 'fall[s] under the [New York] Convention' within the

---

under the New York Convention when the court sits in primary jurisdiction versus secondary
jurisdiction."); *Dedon*, 2010 WL 4227309 *9  ("Furthermore, under the ICC rules and the New
York Convention, the courts with primary jurisdiction over United Kingdom ICC proceedings
are courts of the United Kingdom, not courts in the United States.").

meaning of 9 U.S.C. § 203, so as to provide this Court with original jurisdiction.");[10] *Dedon GmbH v. Janus et Cie*, No. 10-cv-04541 (CM) 2011 WL 666174, *4 (S.D.N.Y. Feb. 8, 2011) ("[O]nly a court in England can stay the arbitration that is pending in England.").[11]

The most directly on point case is *URS Corp.*, in which the U.S. District Court in Delaware refused to enjoin a Paris-seated ICC arbitration. Plaintiff in that case filed suit solely to enjoin the Paris arbitration and to seek a declaration that it was not bound by the arbitration agreement—exactly as Plaintiffs have done here. The *URS* Court determined, however, that it did not have subject matter jurisdiction under Ch. 2 of the FAA. Central to the Court's decision was that the New York Convention vested French Courts with primary jurisdiction over the arbitration (*Id.* at 209) and that only courts vested with primary jurisdiction under the New York Convention are empowered to enjoin arbitration proceedings. *See id.* (distinguishing cases where a U.S. court enjoined arbitral proceedings because the "arbitrations took place on United States soil" thereby vesting "the district courts with primary jurisdiction over those proceedings"). Because the Delaware Court was a court of secondary jurisdiction only, it concluded it had "subject matter jurisdiction [only] over actions to compel arbitration or to enforce an arbitral award." *Id.* at 208. Similarly here, because this Court does not have primary jurisdiction, Plaintiffs claims for declaratory and injunctive relief do not "fall under" the New York Convention, divesting the Court of subject matter jurisdiction.

---

[10] On appeal, the Second Circuit determined it did not have to address the question of Plaintiff's request to stay the arbitration, and therefore did not "resolve the question of whether federal courts have the power to stay arbitration under the FAA (or any other authority)." *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 391 (2d Cir. 2011). The question of anti-arbitration injunctions under Chapter 2 of the FAA is still an open question in this Circuit.

[11] *See also URS Corp.*, 512 F. Supp. 2d at 209 ("[T]he French courts have primary jurisdiction over the pending arbitration and this court declines to extend its jurisdiction over those extraterritorial waters by enjoining the ongoing arbitration in France."); *Ghassabian v. Hematian*, 08CIV.4400(SAS), 2008 WL 3982885 (S.D.N.Y. Aug. 27, 2008) ("Power is expressly conferred on the federal courts to compel arbitration, to appoint arbitrators, or to confirm an arbitration award. . . . [I]t is unreasonable to infer the existence of further remedies.")

Plaintiffs will likely contend, and cite cases for the proposition that, because the FAA authorizes a court to compel arbitration, it implies the power to enjoin arbitration. Indeed, Plaintiffs' motion for preliminary injunction cites four decisions[12] that allegedly support their assertion that the Court has jurisdiction and authority to enjoin the London arbitration. Importantly, however, these cases were either (1) decided under Chapter 1 of the FAA, not Chapter 2, or (2) decided under Chapter 2 of the FAA when the United States is the court of primary jurisdiction under the New York Convention. Accordingly, none control the Court's decision here.

The *American Express* decision is distinguishable in several respects, the most important being that it was decided under Chapter 1 of the FAA and therefore has no bearing on a Chapter 2 case such as this one. Unlike Chapter 2 of the FAA, Chapter 1 creates no independent federal subject matter jurisdiction; instead a federal court must have some other basis for subject matter jurisdiction. *Southland Corp. v. Keating*, 465 U.S. 1, 15 n. 9 (1984). Accordingly, the only issue under Chapter 1 is whether it implies a cause of action to enjoin arbitration.[13] That is a far different question from whether an action to enjoin arbitration "falls under" the New York Convention when the court has only secondary jurisdiction pursuant to that Convention. And, although the FAA provides that "Chapter 1 applies to actions and proceedings brought under [Chapter 2]," it does so only "to the extent that chapter [1] is not in conflict with [Chapter 2] or the [New York] Convention." 9 U.S.C. § 208. Here, implying federal jurisdiction over actions to enjoin arbitration where the U.S. has only

---

[12] *In re: American Express Financial Advisors Securities Litig.*, 672 F.3d 113, 141 n. 20 (2d. Cir. 2011); *Satcom Int'l Group PLC v. Orbcomm Int'l Partners, L.P.*, 49 F. Supp. 2d 331, 342 (S.D.N.Y.1999); *Farrell v. Subway Int'l, B.V.*, No. 11 CIV. 08 JFK, 2011 WL 1085017 (S.D.N.Y. Mar. 23, 2011); and *Maesfield AG v. Colonial Oil Indus., Inc.*, No. 05-cv2230 (PKL), 2005 WL 911770 (S.D.N.Y. Apr. 18, 2005)

[13] Chapter 1, like its Chapter 2 counterpart, describes only two actions: actions to compel arbitration and to enforce an arbitral award, which raises the question of whether there is properly a cause of action to enjoin arbitration in a Chapter 1 case.

secondary jurisdiction conflicts with the New York Convention.  As discussed above, under that Convention, courts of secondary jurisdiction have only the power to compel arbitration, not to enjoin it—a power reserved to primary jurisdictions.[14] Accordingly, cases decided under Chapter 1 of the FAA have no bearing on the subject matter jurisdiction question under Chapter 2.

Moreover, Although the Second Circuit in *American Express* did broadly state that, under Chapter 1 of the FAA, "to enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present," Plaintiffs failed to point out that the Court specifically limited its decision to the "particular circumstances presented" in the appeal, which included a class action settlement agreement providing for the district court's retention of exclusive jurisdiction over disputes relating to the agreement. 672 F.3d at 141 n.20.

Plaintiffs also rely upon the *Satcom* decision to support their contention that the Court has power to enjoin the London arbitration. But like *American Express*, *Satcom* has no bearing on the subject matter jurisdiction issue. In *Satcom*, the Court held that the "logic" of cases implying a cause of action under Chapter 1 of the FAA applied to a Chapter 2 case "where, as here, the district court has a basis for subject matter jurisdiction *other than the Convention* and has personal jurisdiction over the parties." 49 F. Supp. 2d. at 342 (emphasis added). *Satcom* does not address whether Chapter 2 of the FAA is an independent source of federal subject matter jurisdiction over actions to enjoin arbitration when the U.S. has secondary jurisdiction pursuant to the New York Convention.

Only a few courts have specifically held that Chapter 2 of the FAA confers federal subject matter jurisdiction over actions to enjoin arbitration and critically, these have been cases where the

---

[14] Plaintiffs argued in their pre-motion letter that the primary/secondary jurisdiction distinction under the New York Convention applies only to actions to enforce an arbitral award.  However, the *Dedon,* and *URS Corp.* decisions make clear that the primary/secondary jurisdiction matters for challenges to arbitrability and requests to stay and/or enjoin arbitrations as well.

14

U.S. had primary jurisdiction. *E.g. Republic of Iraq v. ABB AG*, 769 F. Supp. 2d 605, 609 (S.D.N.Y. 2011) (arbitration agreement "provid[ed] for arbitration in the United States"); *Farrell*, 2011 WL 1085017, at *1 (arbitration agreement "designat[ed] New York as the site for arbitration").[15] Since, as discussed above, a court with primary jurisdiction is empowered under the New York Convention to enjoin arbitrations, it follows that when the U.S. has primary jurisdiction as to an arbitration, an action to enjoin that arbitration falls under the New York Convention, creating subject matter jurisdiction under Chapter 2. *See URS Corp.*, 512 F. Supp. 2d at 209 ("The fact that the arbitrations took place on United States soil vested the district courts with primary jurisdiction over those proceedings."). Although *Iraq* and *Farrell* did not expressly base their holdings on the primary jurisdiction rationale, the most reasoned way to reconcile these cases with cases such as *URS Corp.*, *Ghassabian*, and *Dedon* is through the primary/secondary jurisdiction distinction.[16]

2.    *The Court Lacks Any Other Source of Subject Matter Jurisdiction*

The Court's subject matter jurisdiction in this case is wholly dependent on Chapter 2 of the FAA.[17]  Plaintiffs claims under the Declaratory Judgment Act do not create a basis for subject matter jurisdiction. *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012). Further, "[t]he All Writs Act also cannot confer jurisdiction on the courts where they do not already possess it." *Stevenson v. Tyco Int'l (US) Inc. Supplemental Executive Ret. Plan*, No. 04-CV-4037 (KMK), 2006 WL 2827635

[15] Both *Farrell* and *Republic of Iraq* cite *Satcom* for the proposition that the FAA confers subject matter jurisdiction over actions to enjoin arbitration, which, as discussed above, is not what *Satcom* holds.  Even if *Satcom* could be read that broadly, New York was the place of arbitration in that case, rendering the *Satcom* court a court of primary jurisdiction.  49 F. Supp. 2d. at 331.

[16] Plaintiffs also rely on the *Maesfield* decision in their motion, which did not address the subject matter jurisdiction issue at all.  Even still, the *Masefield* court had primary jurisdiction under the Convention as the arbitration at issue occurred in the United States.  2005 WL 911770, at *1.

[17] Plaintiffs can make no claim to diversity jurisdiction in an action that pits Caymans-incorporated GEM II, Ltd. against Turkish-resident Mr. Zapsu. *See Mor v. Royal Caribbean Cruises Ltd.*, No. 12 CIV. 3845 JGK, 2012 WL 2333730 (S.D.N.Y. June 19, 2012).

15

(S.D.N.Y. Sept. 29, 2006). Finally, although Plaintiffs alleged a claim under New York law—invoking supplemental jurisdiction—without federal question jurisdiction the court cannot exercise supplemental jurisdiction. *Da Silva v. Kinsho Intern. Corp.*, 229 F.3d 358, 361 (2d Cir. 2000).

     C.    *Plaintiffs Have Not Met Their Burden to Show a Likelihood of Success on the Merits Because They Are Bound by the Non-Competition Agreement*

Although Plaintiffs claim they did not sign the arbitration agreement, the Second Circuit has "repeatedly found that non-signatories to an arbitration agreement may nevertheless be bound according to 'ordinary principles of contract and agency,'" including: (1) incorporation by reference; (2) assumption; (3) veil piercing/alter ego; (4) agency; and (5) estoppel.[18] *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999); *see also Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 661-62 (2d Cir. 2005). Here, Plaintiffs are bound by the arbitration clause under at least the veil piercing/alter ego, estoppel, and/or agency theories.

     1.    <u>Plaintiffs are bound under the veil piercing/alter ego theory.</u>

Under federal common law, a court will pierce the corporate veil and require a non-signatory to arbitrate when it dominates and controls the signatory, and when piercing is necessary to prevent fraud or other wrong. *Lakah*, 2014 WL 1100142 *6. Courts consider many factors including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

---

[18] Mr. Zapsu maintains that English law applies because the NCA selects English law.  NCA, Section 7.1.  However, because federal courts in the Second Circuit often apply federal common law to the question of arbitrability, *see Lakah v. UBS AG*, No. 07 CIV. 2799 MGC, 2014 WL 1100142 *6 (S.D.N.Y. Mar. 20, 2014), Mr. Mr. Zapsu will address the issue under federal law. Nevertheless, the fact that Plaintiffs have failed to analyze the issue under the proper governing law demonstrates that Plaintiffs have not met their burden here.  *See Enargy Power Co. Ltd. v. Xiaolong Wang*, No. 13-11348-DJC, 2013 WL 6234625, at *8 (D. Mass. Dec. 3, 2013).

*Id.* Plaintiffs here are playing fast and loose with their various corporate entities. They contend that only one PineBridge entity, the GEM II Fund, is bound by the arbitration agreement, while simultaneously refusing to confirm that the GEM II Fund has remained adequately capitalized to satisfy an award after they learned of the claim. Plaintiffs' refusal to offer any confirmation demonstrates that their true intent is to hide behind various corporate forms in order to avoid paying Mr. Zapsu any arbitral award he might secure. This is exactly why the veil-piercing doctrine exists, and it is difficult to imagine a stronger case for its application.  In these circumstances it is appropriate to pierce the veil and bind to the arbitration agreement the PineBridge entities that controlled and acted for the GEM II Fund (which could not act except through them).

An analysis of the relevant factors makes this clear.[19]  Plaintiffs and the GEM II Fund all share a common office space at 399 Park Avenue, 4th Floor New York, New York.  The GEM II Fund's Investment Committee used AIG Capital Partners Inc. (now PIP) letterhead when sending memoranda, showing a disregard for corporate formalities. Kendall Decl. ¶ 7 & Exh. F; *see Network Enterprises, Inc. v. APBA Offshore Prods., Inc.*, No. 01 CIV. 11765 (CSH), 2002 WL 31050846 (S.D.N.Y. Sept. 12, 2002) ("Allweiss failed to observe the corporate separateness of the two companies by using LLC letterhead."). Plaintiffs and the GEM II Fund also share the same officers, directors, and employees and are owned by the same parent entity, PIP (formerly AIG Capital Partners). As Patrick McGinnis—a former PIP vice president with whom Mr. Zapsu dealt extensively in conjunction with the For You investment—explained during his testimony in the First London Arbitration, the GEM II Fund is simply a "pot of money" owned by PIP and third-party investors, and the GEM II Fund acted through and was managed by other PineBridge employees and

---

[19] This is based on the evidence currently available to Mr. Zapsu.  Mr. Zapsu believes he would find further evidence to support a veil-piercing/alter ego with minimal discovery.

entities. Kendall Decl. at Exh. A 15:20-23.  Moreover, Plaintiffs intermingled their funds with the

GEM II Fund, contributing their own money into the "pot."  *See supra*, note 2.

In fact, nothing illustrates the inter-relatedness of all of the PineBridge entities better than

McGinnis's confusion in the first arbitration about how to respond to the simple question of who his

actual employer was: stating "that's a great question actually. I believe my employer is AIG because

the pay cheques came from AIG. . . but as a person who had carry and was working on deals in GEM

II [the entity managing the GEM II Fund], I was also—I signed certain agreements with GEM II as

well." Kendall Decl. at Exh. A 16:7-17.  This confusion is shared by the other AIG-PineBridge

employees who worked with Mr. Zapsu. As demonstrated in Kendall Decl. Exh. J, these employees

thought of themselves as employees of AIG Capital Partners, PineBridge Investments or AIG Blue

Voyage Advisors.  None of them saw himself as an employee of the GEM II Fund, and all of them

took direction from the management team at AIG Capital Partners (later PIP). [20]

Further, as Mr. Zapsu explains in his declaration, he dealt with the same group of individuals

in his dealings concerning the Turkish businesses, none of whom represented himself as speaking

just for the GEM II Fund or any other specific PineBridge corporate entity. Zapsu PI Decl. ¶ 9.

Additionally, the Advisory Agreement, by which AIG GEM II, Ltd agreed to provide advisory

services to the GEM II Fund, was signed by the same individual, Peter Yu, on behalf of both entities

and AIG GEM II G.P., L.P., the GEM II Fund's general partner.  D. 13 ¶ 6 & Ex. D. All of these

facts demonstrate the lack of any discretion the GEM II Fund had in making its own decisions. It was

an inert entity whose actions were completely dictated by other PineBridge entities and employees.

---

[20] Since the evidence shows that the GEM II Fund's purported agents and employees were, in fact all working for other entities higher up on the corporate food chain, Plaintiffs may also be bound under an agency theory.  Plaintiffs were directing the GEM II Fund and authorizing its actions, GEM II's signature on the NCA could thus bind Plaintiffs who were the true principals.

Mr. Zapsu also believes that the GEM II Fund is undercapitalized and that Plaintiffs have fraudulently transferred the GEM II Fund's assets to other PineBridge entities to avoid paying an arbitration award against the GEM II Fund in the London arbitration. Kendall Decl. ¶ 11(c).  Shortly after Mr. Zapsu commenced the Second London Arbitration, in an attempt to avoid the dispute that has generated this litigation, Mr. Zapsu's counsel asked PineBridge's lawyers if they could confirm that the GEM II Fund remained sufficiently capitalized to satisfy an arbitration award. Kendall Decl. ¶ 14 With sufficient assurances that the GEM II Fund could satisfy an award, Mr. Zapsu might have agreed to arbitrate against only the GEM II Fund and to dismiss Plaintiffs from the arbitration. *Id.* Unfortunately, PineBridge's counsel declined to offer any such assurances, claiming they could not see how the request was relevant to any pending issues. *Id.* This strongly suggests that PineBridge is trying to hide behind its various corporate entities to avoid paying any award to Mr. Zapsu. If Plaintiffs were concerned about being forced to arbitrate in London, and not merely concerned about avoiding payment, they would have confirmed that the GEM II Fund is capitalized. PineBridge has also taken the GEM II Fund off of its website as an active fund, raising further concerns about fraudulent transfers and undercapitalization. Kendall Decl. ¶ 15. Given these facts, the Court should assume that the GEM II Fund has been depleted.

These facts demonstrate PineBridge's complete disregard of the corporate form (except when corporate separateness provides a defense to potential liability). Accordingly, the Court should pierce the corporate veil and hold that Plaintiffs are bound by the arbitration agreement alongside GEM II Fund.[21] At a minimum these facts raise serious doubts about Plaintiffs' ability to carry their burden of

---

[21] *See Camofi Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462, 473 (S.D.N.Y. 2006). (holding there was a triable issue of fact on piercing veil between funds and managing company where Plaintiff had shown that the funds and investment company were run by the same corporate officers; shared a common office space, address, and email addresses; and that the

establishing a substantial likelihood of success on their claim that they are not bound to arbitrate.

2.      Plaintiffs Are Estopped From Denying Arbitration

"A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause." *Am. Bureau of Shipping v. Tencara Shipyard SPA*, 170 F.3d 349, 353 (2d Cir. 1999). Benefits are "direct" when they arise specifically from the unsigned contract containing the arbitration clause, and when the benefits are specifically contemplated by the relevant parties. *Life Tech. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011). Benefits are "indirect" when they are merely incidental to the contract and where the parties "would not have originally contemplated the non-signatory's eventual benefit." *Id.*

Here, Plaintiffs directly benefited from the NCA by gaining access to Mr. Zapsu's confidential information and are estopped from denying arbitration—particularly as the underlying arbitration concerns Plaintiffs' misuse of that information. These benefits are direct because they arise specifically from the NCA and because the benefits were originally contemplated by the parties. The NCA recognized that the GEM II Fund (and by necessity those persons managing the Fund such as Plaintiffs) would gain access to Mr. Zapsu's confidential information, including his financial information as a result of the GEM II Fund's investment in For You. D. 13 ¶ 4 & Ex. B thereto.  And the NCA required those who gained access to any of Mr. Zapsu's confidential information not to disclose it.  *Id.*; *see Life Tech. Corp.*, 803 F. Supp. 2d at 276-77 ("[T]he Purchase Agreement explicitly contemplates the licensce of the relevant trademarks to DH Tech or one of its

funds "were mere investment vehicles managed and controlled" by the investment company); *Network Enterprises, Inc. v. APBA Offshore Prods., Inc.*, No. 01 CIV. 11765 (CSH), 2002 WL 31050846 (S.D.N.Y. Sept. 12, 2002) ("The allegations show that Allweiss owned LLC and Offshore and shared the same office space with them, and that Allweiss failed to observe the corporate separateness of the two companies by using LLC letterhead in a letter regarding Offshore's contract. The allegations also indicate that Offshore is undercapitalized and that plaintiff has been harmed by Allweiss's control of Offshore in his refusal to allow Offshore to honor the renewal agreement and in his diminishment of Offshore's assets.").

affiliates."). Moreover, as Mr. Zapsu explains, he understood the parties specifically contemplated that PineBridge's representatives would gain access to his confidential information and they would be subject to the non-disclosure obligations of the NCA.  Zapsu PI Decl. ¶ 10.

Because the GEM II Fund had no employees, but rather was managed by other PineBridge entities, any of the confidential information the GEM II fund accessed as a result of its contracts with Mr. Zapsu was necessarily shared with Plaintiffs and the other PineBridge entities.  Indeed, Mr. Zapsu's confidential information was discussed during Investment Committee meetings at the AIG Capital Partners/PIP level, which helped Plaintiffs and other PineBridge entities develop business strategies.  *See* Kendall Decl. ¶ 7 & Exh. E p. 2. (stating that in developing further investment strategy PIP's Scott Foushee "described Mr. Zapsu's financial circumstances" to other PineBridge employees during an Investment Committee call, and stated that "Mr. Zapsu is personally leveraged now and doesn't appear to have significant spare cash.").  Plaintiffs acquired this confidential information only because of the confidentiality provisions in the NCA, as Mr. Zapsu would not have otherwise shared it. Zapsu PI Decl. ¶ 10.  Plaintiffs gained a direct benefit from a contract containing an arbitration clause and are therefore estopped from denying arbitration—especially where, as here, Mr. Zapsu's claims in the arbitration are based on the misuse of his confidential information.

## II.   PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM.

Plaintiffs' delay in bringing this action shows how contrived their assertion of irreparable harm is. The Second Circuit has held that a ten-week delay in moving for a preliminary injunction demonstrated lack of irreparable harm. *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985). After Mr. Zapsu filed the Request for Arbitration in May, Plaintiffs delayed *over twelve weeks* before filing this action.  *See generally* Compl. & Exh. A. Under Second Circuit precedent, this is more than sufficient to undercut Plaintiffs' assertions of irreparable harm.

Plaintiffs' actions since the start of the arbitration further undermine their assertions. Since

the arbitration commenced in May, Plaintiffs have participated in the arbitral process, waiting to seek relief from this Court until shortly before the arbitral tribunal was expected to be constituted. *See Stanchart Sec. Int'l, Inc. v. Galvadon*, No. 12CV2522-LAB MDD, 2012 WL 5286952, at *2 (S.D. Cal. Oct. 24, 2012) (no irreparable harm where party seeking to enjoin arbitration had voluntarily participated in it for months before seeking injunction). During that 12-week period, Plaintiffs sought a finding by the ICC Court that they were not properly joined as parties under the NCA.  Compl. Exh. C. Plaintiffs therefore recognized the ICC's jurisdiction to determine arbitrability under its own rules. Moreover, when the ICC Secretariat referred Plaintiffs' jurisdictional challenges to the arbitral tribunal on July 7, 2014, Compl. Exh. E, Plaintiffs waited *another five and a half weeks* to seek relief from this Court. Plaintiffs' delay here shows that they were fully prepared to defend the arbitration and that they possessed and still possess other avenues for relief absent an injunction.

In addition, Plaintiffs' assertions of irreparable harm simply do not ring true. Plaintiffs point to a series of cases that they argue control the outcome here, but which actually do not. According to Plaintiffs, these cases purport to stand for the proposition that being wrongfully hauled into an arbitration is *per se* irreparable harm. But Plaintiffs' arguments fail for two reasons.

First, although it is true that a party can be irreparably harmed by "being forced to expend time and resources arbitrating an issue that is not arbitrable," *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (citing *Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Relations*, 107 F.3d 979 (2d Cir. 1997)), Plaintiffs' reliance on this principle rushes to its conclusion (irreparable harm) without establishing the condition upon which this conclusion relies— that the issues raised by Mr. Zapsu are not arbitrable in the first place. Put another way, Plaintiffs have suffered irreparable harm only if they succeed on the merits. *See Lexington Children's Center v. District Council 1707*, No. 04-Civ.1532(PKC), 2004 WL 540475, at *9 (S.D.N.Y. Mar. 17, 2004)

(denying motion to enjoin arbitration where dispute was properly arbitrable).

Second, Plaintiffs ignore the fact that, no matter what, the GEM II Fund must defend the arbitration.  Because, as discussed above, the GEM II Fund has none of its own employees, the same witnesses, documents, evidence, and attorneys will be used in the arbitration whether Plaintiffs appear or not. Plaintiffs will have to expend the same "time and resources" in the arbitration regardless of whether this Court grants the injunction, so Plaintiffs cannot show any irreparable harm.[22]  In fact, this is just further evidence that Plaintiffs filed this suit for the sole purpose of ensuring that Mr. Zapsu can arbitrate only against a judgment-proof shell entity and not out of any concern for wasting their time and resources by participating in the London arbitration.

Courts must evaluate irreparable harm on a case-by-case basis. *Int'l Creative Mgmt., Inc. v. Abate*, No. 07 CIV. 1979 PKL, 2007 WL 950092, at \*7 (S.D.N.Y. Mar. 28, 2007).  In this case, joining Plaintiffs will not force the PineBridge entities to expend any additional "time and resources," thus obviating the Second Circuit's concerns that Plaintiffs mistakenly trumpet. *Cf. Merrill Lynch*, 337 F.3d at 129. Whether or not this Court enjoins Mr. Zapsu from proceeding against Plaintiffs, the cost to the Plaintiffs of conducting the arbitration will be the same. *See Robins v. Zwirner*, 713 F. Supp. 2d 367, 374 (S.D.N.Y. 2010) (recognizing that the "mere possibility of harm is not sufficient; rather, the harm must be real and imminent"); *Danny's Const. Co, Inc. v. Birdair, Inc.*, 136 F. Supp. 2d 134, 140 n.4 (W.D.N.Y. 2000) (rejecting plaintiff's assertion that it would suffer irreparable harm by being forced to "contest[] the same facts and legal issues in two

---

[22] Many of the cases upon which Plaintiffs rely are inapposite because they address defendants that have no corporate connection to the signatories and where there was no suggestion that the plaintiff was the alter ego of a signatory.  In the only case Plaintiffs identify where there is any corporate relationship between the signatory and non-signatory, *Merrill Lynch*, 337 F.3d at 128, there was no suggestion the plaintiffs had failed to respect corporate formalities, had deliberately undercapitalized the signatory to the arbitration agreement, or had fraudulently transferred assets to avoid arbitration.

separate proceedings"). At most, Plaintiffs would be required to *duplicate* resources rather than waste them. *See Marjam Supply Co. v. Firestone Bldg. Products Co., LLC*, No. 11-7119 WJM, 2013 WL 85086, at *2 (D.N.J. Jan. 7, 2013) (rejecting motion to stay arbitration and noting that if the court were to apply the preliminary injunction standard, it would still deny the motion because the arbitration would involve some *duplication* of resources); *Oppenheimer & Co. Inc. v. Deutsche Bank AG*, No. 09 CIV. 8154 (LAP), 2009 WL 4884158, at *5 (S.D.N.Y. Dec. 16, 2009) (distinguishing *Merrill Lynch* and concluding that the plaintiff's expenditure of "more resources conducting duplicative discovery," etc. was a mere economic injury). Plaintiffs have therefore failed to demonstrate not only irreparable harm, but any real harm whatsoever.

## III.   THE BALANCE OF EQUITIES DISFAVORS GRANTING INJUNCTIVE RELIEF

The balance of equities tips in Mr. Zapsu's favor. This motion is just a ploy to deny Mr. Zapsu any recovery on his claims by forcing him to arbitrate against an entity they refuse to confirm can pay a full award. Plaintiffs' proclivity for these strategic uses of process is evidenced by their internal descriptions of the First London Arbitration as an "arbitration plan" to "leverage[e] GEM II's legal options in order to recover the investment" in For You by using "the threat of arbitration and potential damage to the Zapsu family's reputation [to] bring[] [Mr. Zapsu] to the negotiating table" and force a deal to obtain shares in a more valuable company (called A-101). Kendall Decl. ¶ 7 & Exh. E at.2-3, Exh. F at 13. This litigation is just another example of Plaintiffs' abusive litigation strategies. If the Court grants their injunction, it will be countenancing these wrongful tactics. Accordingly, it would be inequitable to grant injunctive relief here.

## IV.   THE PUBLIC INTEREST FAVORS DENYING THE MOTION

The public interest disfavors injunctive relief here. U.S. courts have an interest in promoting the principle of comity; that is, one state's recognition of another's judicial and quasi-judicial

proceedings, and this is particularly acute when enjoining foreign actions. *See Ibeto Petrochemical Industries Ltd v. M/T BEFFEN*, 475 F. 3d 56, 65 (2d. Cir. 2007) ("[D]ue regard for principles of international comity and reciprocity require . . . that [foreign anti-suit] injunctions should be used sparingly."). Although this principle had traditionally applied to one court's recognition of another court's judicial proceedings, the Second Circuit has acknowledged that it must also extend to U.S. courts' respect for international arbitral proceedings. *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 125 (2d Cir. 2007) ("[C]oncerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes . . . require us to protect the regime established by the Convention for enforcement of international arbitral awards."); *URS Corp.* 512 F. Supp. 2d at 210 ("[C]omity and the purposes of the New York Convention do not support issuing an injunction against a foreign arbitral proceeding").

Indeed, failing to respect international comity could encourage courts in other jurisdictions to do harm to U.S. entities. Suppose that a U.S. entity agrees to arbitrate commercial disputes with a Chinese or Russian entity in a U.S. seat arbitration governed by U.S. law. Entering an injunction here could provide a precedent to a Chinese or Russian court to enjoin a U.S. entity from conducting a U.S. arbitration.  If American courts do not promote comity, they create the risk for foreign courts doing the same. *See id.* ("The primary *reason* for giving effect to the rulings of foreign tribunals is that such recognition factors international cooperation and encourages reciprocity."). Accordingly, allowing the ICC arbitration to proceed promotes the public interest in this Court's respect for parallel proceedings in other jurisdictions and encourages foreign tribunals to do likewise.

## CONCLUSION

For all these reasons, the Court should deny the Plaintiffs' motion to enjoin the arbitration.

Date: September 18, 2014

Respectfully submitted,

ABDULAZIZ GEYLAN ZAPSU,

By his attorneys,


/s/ Michael Kendall
Obiamaka P. Madubuko
 omadabuko@mwe.com
MCDERMOTT WILL & EMERY LLP
340 Madison Ave.
New York, NY 10173-1922
T: 212.547.5308
F: 212.547.5444


*Of counsel*
Michael Kendall (admitted *pro hac vice*)
 mkendall@mwe.com
David Gacioch (admitted *pro hac vice*)
 dgacioch@mwe.com
Matthew McCrary (*pro hac vice* motion
forthcoming)
 mmccrary@mwe.com
Evan Panich (admitted *pro hac vice*)
 epanich@mwe.com
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109-1775
T: 617.535.4000
F: 617.535.3800

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 18,2014.

Nancy Chung

Christopher Egleson

Stan Chiueh

Akin Gump Strauss Hauer & Feld LLP

One Bryant Park

Bank of America Tower

New York, NY 10036-6745

Dated: New York, New York
       September 18, 2014

                                  __/s/ Michael Kendall_____

DM_US 54626131-3.084974.0012